# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT 100089599433619 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | ) Case No. 23 M 660 <br> ) <br> ) <br> ) <br> ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371; 922(a)(1); 922(a)(6); 922(g)(1); 922 (k) | Conspiracy; Dealing firearms without a license; Lying and buying; Unlawful possession of firearms and ammunition by a convicted felon; Receiving/ship/transport of a firearm with an obliterated serial number. |

The application is based on these facts:

See Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sean Carlson, ATF SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ *(specify reliable electronic means)*.

Date: 6 21 23

_____
*Judge's signature*

City and state: Green Bay, Wisconsin

Honorable Magistrate Judge Sickel
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT<br>FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT 100089599433619 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | **Filed Under Seal** |

<strong>AFFIDAVIT IN SUPPORT OF<br>AN APPLICATION FOR A SEARCH WARRANT</strong>

I, Special Agent Sean Carlson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2. I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assigned to the Milwaukee Field Office since November 2015. I have been employed as a full-time law

enforcement officer for approximately fifteen years. Prior to my employment at ATF, I was a Patrol Officer at the Hammond Police Department in Hammond, Indiana for over four (4) years, and then I served approximately five (5) years as a Federal Air Marshal with the U.S. Department of Homeland Security.

3.     As a Special Agent, I have participated in the investigation of firearms and narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, and weapons. As a firearms investigator, I have interviewed many individuals involved in firearm and drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of firearms and controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances.

4.     Based on my training, experience and participation in drug trafficking and firearms trafficking investigations, I know and have observed the following:

5.     I have relied on informants to investigate firearms trafficking and drug trafficking. Through informant interviews and debriefings of individuals involved in those offenses, I have learned about the manner in which individuals and organizations finance, purchase, transport, and distribute firearms and narcotics both within and outside of Wisconsin. I have utilized informants to conduct "controlled purchases" of firearms and controlled substances from individuals, as opposed to licensed gun dealers. I have also conducted surveillance of individuals engaged in firearms and drug

2

trafficking and participated in the execution of numerous search warrants resulting in the seizure of drugs, firearms, ammunition, and magazines.

6.     Based on my training and experience, I have become familiar with the language utilized over the telephone to discuss firearms and drug trafficking and know that the language is often limited, guarded, and coded. I also know that firearms and drug traffickers often use electronic devices (such as computers and cellular phones) and social media to facilitate these crimes.  Based on my experience, I know that firearms traffickers may keep photographs of these items on electronic devices.

7.     I also know that drug traffickers and firearms traffickers commonly possess—on their person, at their residences, at their places of business, in their vehicles, and other locations where they exercise dominion and control—firearms, ammunition, and records or receipts pertaining to such.

8.     I know that firearms traffickers and drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate these and related offenses. I also know that firearm and drug traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. I also know that firearm and drug traffickers often use nominees to purchase or title these assets to avoid scrutiny from law enforcement.

9.     During the course of my career, I have conducted criminal investigations involving the use of social media.  Additionally, I have received training and instruction regarding the use of social media sites by criminal elements.  I have conducted previous

3

criminal investigations in which internet research that I conducted yielded the use of social media by suspects. Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social media website. The "instant message" / "in-box message" is a private communication from one user to another. Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others. Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as narcotics, unexplained large amounts of cash, and firearms. Also, suspects in criminal investigations have been known to post statements and/or lyrics on social websites referencing their own criminal activity.

10.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

11.     Based on my training, experience, and the facts as set forth in this affidavit, there is probable cause to believe that Temaj S. BESS (B/M, DOB 02/06/2001) committed a violation of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(a)(1) (dealing

4

firearms without a license), 18 U.S.C. § 922(a)(6) (lying and buying), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition by a convicted felon), and 18 U.S.C. § 922 (k) (receiving/ship/transport of a firearm with an obliterated serial number). There is also probable cause to search the information described in Attachment A for evidence of this crime, as described in Attachment B.

## TARGET ACCOUNTS TO BE SEARCHED

Facebook account showing vanity name "Temaj Bess" with Facebook User ID # 100089599433619, https://www.facebook.com/profile.php?id=100089599433619

## PROBABLE CAUSE

12. On March 16, 2023, Appleton Police Department (PD) arrested Jeremiah D. RANDOLPH (B/M, DOB 03/17/2004) for felon in possession of a firearm pursuant to a state of Wisconsin (act 79) search conducted by RANDOLPH's probation agent. It should be noted, RANDOLPH is prohibited from possessing firearms based on previous state of Wisconsin felony convictions for bail jumping.

13. During the Act 79 search of RANDOLPH's residence, RANDOLPH's probation agent located a firearm with an obliterated serial number, which was turned over to Appleton PD. Appleton PD Sgt. Michael Chevremont arrested RANDOLPH for the located firearm, and during a mirandized interview with Appleton PD, RANDOLPH stated he received the firearm from a subject named Temaj S. BESS (B/M, DOB 02/06/2001) in Fall of 2022. RANDOLPH stated he asked BESS to purchase the firearm on his behalf, because he wanted it for personal protection. RANDOLPH stated

5

he stopped carrying the firearm outside of his residence, after co-workers warned him it was illegal for him to possess a firearm. RANDOLPH further stated he went with BESS to the Federal Firearms Licensee (FFL) when BESS purchased the firearm, and RANDOLPH paid approximately $200 to BESS, in order for BESS to purchase the firearm. RANDOLPH stated BESS lived on "Newberry Street" in Appleton, WI

14.     The recovered firearm is more particularly described as a Taurus pistol (model G2C, 9 mm, with an obliterated serial number).

15.     Following the interview with RANDOLPH, Appleton PD Sgt. Chevremont went to Federal Firearms Licensee (FFL) Mister Money, located at 1933B N. Richmond Street, Appleton, Wisconsin and retrieved surveillance camera footage for the purchase, which occurred on October 25, 2022. Review of the footage depicts a subject matching BESS' physical description and a person Sgt. Chevremont recognized as RANDOLPH at the store with BESS. RANDOLPH is observed looking at the firearms and pointing to the firearms in the case prior to BESS completing the ATF Form 4473 background paperwork and BESS purchasing the firearm.

16.     The firearm involved in this purchase is more particularly described as a Taurus pistol (model G2C, 9 mm, bearing serial no. ACB600569).

17.     On March 23, 2023, Appleton PD Sgt. Chevremont called the user of cellular phone number 773-220-3134, and the subject verbally identified themselves as Temaj BESS. Sgt. Chevremont arranged for BESS to come to Appleton PD later that day for an interview.     During the recorded interview, BESS stated he has previously

6

purchased approximately seven (7) firearms, but he stated they were all currently missing and no longer in his possession. BESS stated his previous purchases included a Glock pistol, Taurus pistol, and an unknown rifle. BESS stated he remembered the transaction for the aforementioned Taurus pistol at the FFL Mister Money, and he stated RANDOLPH was with him at the time of purchase. BESS stated he paid $310 and he borrowed the money to buy the firearm from RANDOLPH. BESS stated he was buying the firearm for himself, but approximately one week after the purchase of the firearm he realized he would be unable to pay RANDOLPH back. BESS stated at this point he gave RANDOLPH the firearm. BESS stated he knew RANDOLPH was unable to legally purchase a firearm for himself because he was 18 years old at the time BESS gave RANDOLPH the pistol. BESS stated RANDOLPH paid him the funds for the firearm purchase via Cashapp. BESS stated he did not remove the serial number from the firearm.

18. During the interview with Sgt. Chevremonte, BESS stated he currently resides at 1820 E. Newberry Street, Appleton, WI.

19. It should be noted, on May 1, 2023, Your Affiant conducted a search of law enforcement databases and determined 773-220-3134 has been associated with Temaj BESS, through public records, from August 2019 to present.

20. In addition to the transaction with RANDOLPH, BESS stated he also bought a firearm for a subject named "Patrick WASSINK" at FFL Pawn America, located in Grand Chute, WI. BESS stated he also went to the FFL with WASSINK and he

7

gave WASSINK the firearm immediately after the sale. It should be noted, Sgt. Chevremont later identified Patrick WASSINK as Patrick A. WATSON (DOB 07/04/2001).

21.     During the interview with BESS, BESS stated to Sgt. Chevremont his address was 1820 E. Newberry Street, Appleton, WI.

22.     On April 19, 2023, SA Carlson queried ATF eTrace reports for law enforcement firearm traces associated Temaj BESS and located the following reports:

- **ATF eTrace Report no. T20230151063** which detailed Temaj BESS' purchase of a Taurus pistol (model G2C, 9 mm, bearing serial no. ACB600569) from FFL Mister Money on October 25, 2022. This firearm was recovered on March 16, 2023, in the possession of Jeremiah D. RANDOLPH. The time-to-crime was **142 days**.

- **ATF eTrace Report no. T20220566489**, which detailed Temaj BESS' purchase of a Taurus pistol (model G3C, 9 mm, bearing serial no. ADA795418) from FFL Fleet Farm, located at 3035 West Wisconsin Avenue, Appleton, Wisconsin, on May 05, 2022. This firearm was recovered on November 04, 2022, in the possession of Zacorian TURNER (DOB 07/24/2004). The time-to-crime was **183 days**.

23.     Your affiant knows from information published by the ATF's Violent Crime Analysis Branch (as of June 16, 2016) the national average for a gun to be recovered in a crime by law enforcement after the original purchase date is **10.48 years**

8

(also known as "time to crime"). Additionally, the average time to crime of firearms in Illinois is **11.81 years** and **8.18 years** in Wisconsin. In your affiant's training and experience, a subject with law enforcement traces of multiple firearms with a low time-to-crime can be an indicator that the purchaser is engaged in firearms trafficking.

24. On or around April 14, 2023, Sgt. Chevremont observed on BESS' publicly visible Instagram profile username "lilgen5frmdaa" the following three photographs which depicted BESS holding an item in a manner consistent with someone holding a firearm. The photographs had emoji placed over the item BESS was holding, so as to obscure the item.



25. Sgt. Chevremont previously identified this Instagram profile as belonging to BESS because the profile photograph and numerous photographs posted to the account depict BESS. Sgt. Chevremont also located a Facebook.com profile (Facebook username "Temaj Bess", User ID no. 100089599433619, https://www.facebook.com/profile.php?id=100089599433619) belonging to BESS. The photograph depicted below was captured from BESS' Facebook profile, and it depicts

9

BESS as the owner of the profile with the vanity name "Temaj Bess" prominently displayed. This account also lists Appleton, WI as where the owner of the account lives. Finally, this account lists an Instagram account as belonging to him as well.



26.     Your affiant knows from training and experience that it is common for those engaged in firearms trafficking to utilize social media to advertise firearms they have for sale as well enhance their social stature within their peer group.

27.     On April 19, 2023, Sgt. Chevremont interviewed Patrick WATSON, at the Appleton police department, regarding the firearm BESS stated he purchased. It should be noted, prior to this interview, Sgt. Chevremont determined using a law enforcement database that BESS purchased a Glock pistol (model Glock 19 Gen 5, 9 mm, bearing serial no. BUHK214) from Pawn America, located at 500 N. Westhill Boulevard, Grand Chute, Wisconsin, on September 7, 2022. During the interview, WATSON stated he

10

knew BESS and both individuals hung out in the same friend group. WATSON stated he purchased the aforementioned Glock pistol from BESS. WATSON stated before BESS purchased the Glock pistol, WATSON tried to purchase the same firearm directly from Pawn America. WATSON stated he completed the ATF Form 4473 for the firearm, but Pawn America did not call him back to complete the purchase. WATSON stated to Sgt. Chevremont he was unsure if he could legally purchase the firearm because he had been previously charged for felony crimes in Wisconsin as a juvenile. WATSON stated on September 7, 2022, the day BESS purchased the Glock pistol from Pawn America, WATSON met with a group of friends, including BESS. WATSON stated the group went to Pawn America together, and BESS purchased the firearm. WATSON stated BESS paid approximately $500 for the pistol. WATSON stated he told BESS at the time of the purchase that he would buy the firearm from him for "a little bit more" than BESS paid for it. WATSON stated on that same date, he offered BESS $650 or $700 for the firearm and BESS agreed to sell it for that price. WATSON stated he went to his brother's house to get the money and met BESS later on September 7, 2022, and completed the purchase of the firearm from BESS. WATSON stated he took possession of the firearm less than a "couple hours" after BESS purchased the firearm and WATSON believed BESS could purchase the firearm for him because he was "legal".

28. In addition to describing the firearm transaction with BESS, WATSON stated his only point of contact with BESS was through BESS' aforementioned Facebook

11

account. WATSON also stated he knew BESS could legally purchase firearms because of previous conversations he had with BESS prior to the purchase on September 7, 2022. WATSON stated he did not know why BESS purchased the Glock that day because BESS already owned a firearm. WATSON also stated he knew BESS had previously purchased several other Glock pistols, but he had only seen him in possession of one. When asked where the other Glock pistols were, WATSON replied "I don't know. I know he bought me one"; however, he later corrected this statement by saying BESS bought the firearm for himself.

29. It should be noted, WATSON is federally prohibited from possessing a firearm and/or ammunition based on a state of Wisconsin juvenile felony conviction for robbery with use of force.

30. On or around May 11, 2023, Sgt. Chevremont observed on BESS' publicly visible Instagram profile username "lilgen5frmdaa" the following photograph depicting a what appears to be a black male with a tattoo on their right hand, firing a pistol in a wooded area.



31.     It should be noted, your affiant is aware BESS has a prominent tattoo on his right hand in a location consistent with the hand depicted in the above Instagram photograph, leading him to believe BESS is likely the possessor of this firearm.  See the below photograph captured from BESS' Facebook.com profile which depicts BESS and his tattooed right hand.

13



## FACEBOOK INFORMATION

32.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

33.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addressees, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

14

34.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

35.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

36.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also

15

post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

37.    Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

38.    Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

39.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

40.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as

well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

41. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

42. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

43. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

44. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

45. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

17

46.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

47.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For

18

example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

51.     Based on the forgoing, I request that the Court issue the proposed search warrant and I submit that this Affidavit supports probable cause for a search warrant authorizing the search of the Facebook account belonging to T. BESS further described in Attachment A for the items of evidence described in Attachment B.

52.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court of the Eastern District of Wisconsin is a district court of the United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i).]  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

20

23 M 660

_____

Sean Carlson, ATF Special Agent

Subscribed and sworn to me this 21 day of June, 2023.

_____
Honorable Magistrate Judge Sickel

21

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information between May 1, 2022 and Present Date, associated with the Facebook vanity name "Temaj Bess" with Facebook User ID # 100089599433619, https://www.facebook.com/profile.php?id=100089599433619 that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a social networking company headquartered in Menlo Park, California.

## ATTACHMENT B
## Particular Things to be Seized

**Information to be disclosed by Meta Platforms, Inc.**

1.     To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

    a.  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.  All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    c.  All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

    d.  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers;

groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f.  All "check ins" and other location information;

g.  All IP logs, including all records of the IP addresses that logged into the account;

h.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.  All information about the Facebook pages that the account is or was a "fan" of;

j.  All past and present lists of friends created by the account;

k.  All records of Facebook searches performed by the account;

l.  All audio messages sent by the account and messages received by the account;

m. All video messages sent by the account and to the account;

2

n. Any and all location data that is recorded by Facebook related to the account

o. All information about the user's access and use of Facebook Marketplace;

p. The types of service utilized by the user;

q. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s. All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken..

**Information to be seized by the government**

1. All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(a)(1) (dealing firearms without a license), 18 U.S.C. § 922(a)(6) (lying and buying), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition by a convicted felon), and 18 U.S.C. § 922 (k) (receiving/ship/transport of a firearm with an obliterated serial number).

3

a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

b. Evidence indicating how and when the Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Instagram account owner;

c. Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

d. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e. The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

**Information to be seized by the government**

1.      All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(a)(1) (dealing firearms without a license), 18 U.S.C. § 922(a)(6) (lying and buying), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition by a convicted felon), and 18 U.S.C. § 922 (k) (receiving/ship/transport of a firearm with an obliterated serial number):

4

a.  The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

b.  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

c.  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

d.  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e.  The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

5

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
## RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under

the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the

information contained in this declaration is true and correct.  I am employed by Meta

(Facebook), and my official title is _____.  I am a custodian of

records for Meta (Facebook).  I state that each of the records attached hereto is the

original record or a true duplicate of the original record in the custody of Facebook, and

that I am the custodian of the attached records consisting of _____

(pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business

activity of Facebook; and

c.      such records were made by Meta (Facebook) as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the

Federal Rules of Evidence.

_____         _____
Date                                                   Signature